# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-KA-00186-COA

**MARC LEWIS**                                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                              **APPELLEE**

DATE OF JUDGMENT:            12/19/2013
TRIAL JUDGE:                 HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:   HINDS COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:      OFFICE OF STATE PUBLIC DEFENDER
                             BY: GEORGE T. HOLMES
ATTORNEYS FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                             BY: BARBARA WAKELAND BYRD
                                 JOHN R. HENRY JR.
DISTRICT ATTORNEY:           ROBERT SHULER SMITH
NATURE OF THE CASE:          CRIMINAL - FELONY
TRIAL COURT DISPOSITION:     CONVICTED OF MURDER AND
                             SENTENCED TO LIFE IN THE CUSTODY
                             OF THE MISSISSIPPI DEPARTMENT OF
                             CORRECTIONS
DISPOSITION:                 AFFIRMED - 07/28/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., ISHEE AND MAXWELL, JJ.**

**ISHEE, J., FOR THE COURT:**

¶1.     On April 15, 2011, Marc Lewis shot and killed his mother, Sharmeise Church. He

was convicted of murder in the Hinds County Circuit Court following a jury trial that

occurred in November 2013. He was sentenced to serve life in the custody of the Mississippi

Department of Corrections (MDOC). On appeal, Lewis raises the following issues: (1)

whether the circuit court erred in excluding lay-witness testimony regarding Lewis's mental

health; (2) whether the circuit court denied Lewis the right to make a record for appellate review; and (3) whether the weight of the evidence supports a murder conviction. Finding no error, we affirm.

**FACTS**

¶2. In the early morning hours of April 15, 2011, between 4:30 and 5:00 a.m., Church died from a single gunshot wound to her abdomen. Lewis, his grandfather, Bobby Lewis, his sister, Aereal, and his baby, Maurianna, all lived in Church's home at the time of the incident. When authorities arrived at Church's home, Lewis was identified by his family as the shooter. Lewis was soon charged with murder, and a trial took place in the circuit court from November 12 through November 14, 2013.

¶3. Bobby and Aereal both testified at trial and gave their accounts of what had happened on the morning in question. Bobby testified that he had been asleep in his bedroom when he heard a gunshot and ran into the hall. There, he found Church telling him to call 911 because "this boy" had shot her. Aereal called 911, and Bobby found Lewis under the carport. Bobby returned to find Church lying on the floor with her head in Aereal's lap. When Bobby asked Lewis what he had done, Lewis replied, "nothing Granddad." When Bobby stated again that he thought Lewis had done something to Church, Lewis replied that she was "faking," and there was nothing wrong with her.

¶4. Bobby testified that Lewis had a gun, and he was "out of it." Bobby stated that Lewis pointed the gun at Bobby's head, and Bobby pushed it away. Lewis placed the gun in his pocket. Then, while Bobby was pretending to be distracted by caring for Church, Bobby

2

grabbed the gun out of Lewis's pocket.

¶5. Aereal also testified at trial. Aereal stated that in the early morning hours of April 15, 2011, she was in her room when she heard her mother on the phone with police describing a situation with Lewis. Church hung up the phone, and then Aereal heard a gunshot followed immediately by Church yelling in the hall that "Marc shot [her]." Aereal opened her bedroom door and saw Church on the floor in the hallway holding her side. Aereal called 911.

¶6. Aereal testified that Lewis had been drinking vodka with Aereal's boyfriend, Michael Boykins, in the late-night and early-morning hours leading up to the shooting. She stated that Lewis and Boykins drank together every day or at least every other day. Boykins left shortly before the shooting and came back after the shooting upon realizing during a phone conversation that Aereal was upset.

¶7. Boykins testified that he and Lewis had been together that night, but he said that they stayed outside and never entered the house. He stated that they purchased a liter of Taaka vodka and each took one Ecstasy pill. Boykins said that he and Lewis stood outside, drank the vodka, and listened to music until he left sometime after 4:00 a.m. After Boykins left, he called Aereal on his way home, and she started crying, so he turned around and returned to the house to find out what had happened. When Boykins arrived back at the house, he saw Aereal and Lewis arguing in the hallway and Church lying on the floor in the hall. Boykins stated that Lewis had a gun and that he saw Bobby take it away from him. Boykins took Lewis out of the house as the police were arriving, and they detained Lewis.

¶8. Lewis testified at the trial as well. He testified that, in the hours prior to the shooting, he and Boykins had been drinking vodka and had each taken Ecstasy. Lewis contended, however, that they had not stayed outside at his house as Boykins had said, but rather they had gone to an apartment complex in town and stayed there until nearly 4:00 a.m. Lewis stated that upon leaving the apartment complex, Boykins drove them back to Church's house, and Lewis and Boykins were fighting when they entered the house. Lewis testified that their fighting woke Church up, and she told him to go outside to the carport. According to Lewis, it was at that point when his gun went off accidentally and hit Church. Lewis stated that he loved his mother and never meant to shoot her.

¶9. After deliberations, the jury returned a guilty verdict for murder. Lewis was then sentenced to life in the custody of the MDOC. Aggrieved, he now appeals his conviction.

## DISCUSSION

### I. Whether the circuit court erred in excluding evidence about Lewis's mental health.

¶10. Prior to the trial, the State filed a motion in limine seeking to preclude the defense from presenting any evidence relating to Lewis's past or present "mental health illness, mental health treatment, [or] mental health issues." Its argument was in light of the fact that Lewis did not plan to assert an insanity or diminished-capacity defense, but instead sought the lesser-included offense of culpable-negligence manslaughter. The defense argued that Lewis has a history of mental illness, and that testimony regarding such was necessary in order to prove Lewis's theory of manslaughter.

¶11. The circuit court conducted a hearing on the motion in limine and took the matter

4

under advisement.  The circuit court later granted the motion and found that because Lewis was asserting a defense of manslaughter, his state of mind was not at issue.  The Mississippi Supreme Court has emphasized that with regard to seeking a conviction of manslaughter, "the issue . . . is not 'state of mind' but whether the [defendant] acted in the heat of passion and without malice."  *Taylor v. State*, 452 So. 2d 441, 449 (Miss. 1984).  "The question is an objective one, being whether a reasonable man would have been so provoked."  *Id*.

¶12.    In the case of *Dabney v. State*, 772 So. 2d 1065, 1069 (¶13) (Miss. Ct. App. 2000), the defendant argued that his mild retardation should have been taken into account when determining whether he was reasonably provoked in shooting someone.  This Court stated the following:

> In *Taylor*, the Mississippi Supreme Court held that the question of whether the accused has acted in the heat of passion is to be resolved by utilization of an objective standard.  The standard presupposes an individual without serious mental and emotional defects.  Therefore, Dabney's mental retardation, in the absence of an insanity defense, is irrelevant to the issue of whether he acted in the heat of passion.

*Id*. (internal citations omitted).

¶13.    Mississippi law does not recognize diminished capacity as a defense to a criminal charge.  *Brown v. State*, 981 So. 2d 1007, 1015 (¶24) (Miss. Ct. App. 2007).  "In order to prove that a defendant had the mental capacity to commit the crime, the State must only show that he knew right from wrong under the *M'Naghten* test."  *Id*. (quoting *Cannaday v. State*, 455 So. 2d 713, 720 (Miss. 1984)).  Mississippi uses the *M'Naghten* test for "determining whether a person was sane" at the time he or she committed a crime.  *Rayford v. State*, 47 So. 3d 217, 219 (¶8) (Miss. Ct. App. 2010) (citing *Woodham v. State*, 800 So. 2d 1148, 1158

5

(¶29) (Miss. 2001)).  "Under the *M'Naghten* test, the accused must be laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong."  *Id*.  (quoting *Roundtree v. State*, 568 So. 2d 1173, 1181 (Miss. 1990)).

¶14.   During a competency hearing, the State produced a report from the psychiatrist who evaluated Lewis.  The report stated that Lewis was aware of the facts and circumstances at the time of the alleged crime and that he appreciated the quality and nature of his actions at that time.  In addition, Lewis did not pursue an insanity or diminished-capacity defense.  Accordingly, it is clear that Lewis's mental history was irrelevant in his pursuit of a manslaughter conviction rather than a murder conviction.

¶15.   Nonetheless, Lewis argues that during Bobby's direct examination by the State, Bobby opened the door to questioning regarding Lewis's mental state by saying Lewis was "out of it" immediately following the shooting.  On appeal, Lewis argues that he had the right to explore what Bobby meant by that on cross-examination.  The exchange to which Lewis is referring is as follows:

> State:          . . . [D]id you take the gun [from Lewis]?
>
> Bobby:      Well, at this time when he put the gun in the pocket, I just said, Lord, I gotta get that gun.  I'm not gonna have but one chance to get it and one chance only.  So I still kept focus on [Church] because I knew he was out of it, and so I just reached over like that, and I grabbed the gun with one reach.  I didn't even look . . . .

¶16.   The direct examination continued without objection.  The State finished questioning Bobby, and the court recessed for lunch.  After the lunch break, the court addressed several

6

matters outside the presence of the jury. It was at this time that the defense asserted that they had a right to cross-examine Bobby regarding what he meant by the statement that Lewis was "out of it." Specifically, the defense wanted to ask Bobby if, in using that phrase, he meant that Lewis was intoxicated or if Bobby thought Lewis was "out of it" due to his mental history.

¶17. The trial judge found that the State had not opened the door because the witness's statement was not in response to a question. Furthermore, the judge ruled that it did not matter if the defense questioned Bobby, because if Bobby testified that Lewis was intoxicated, intoxication is not a defense, and if it was "related to [Lewis] being crazy or out of his mind," it is not relevant under *Taylor*. We agree with the circuit court, and find that the State did not open the door to cross-examination regarding Lewis's mental history. Lewis's arguments regarding the exclusion of evidence of his mental history are without merit.

  **II.**   **Whether the circuit court denied the right to make a record for appellate review.**

¶18. Prior to the trial, the defense moved ore tenus to stop the trial from moving forward and asked that Lewis be offered a plea bargain for the crime of manslaughter. The defense produced a letter that had been signed by seven of Lewis's and Church's family members asking the State "not to proceed in a criminal trial given [Lewis's] mental health and his mental issues." In the alternative, the defense asked that, if the court chose to proceed with the trial, the letter be placed into the record for the purpose of the appeal to demonstrate that the State had "blatantly ignored the Mississippi victims['][-]rights laws by forcing [the] trial

7

forward." The State objected to the letter due to the circuit court's earlier granting of its motion in limine, which precluded the defense from offering any information relating to the victim-impact statement.

¶19. The trial judge denied the defense's requests. In doing so, he found that he would consider the letter to be a victim-impact statement under Mississippi Code Annotated section 99-43-33 (Rev. 2007). The statute provides that "[t]he victim has the right to present an impact statement or information that concerns the criminal offense or the sentence during any entry of a plea of guilty, sentencing[,] or restitution proceeding." As such, the trial judge found that the letter would be more appropriately offered at the sentencing phase of the trial. Lewis argues that the circuit court's ruling denied him the right to make a record for appellate review.

¶20. Although Lewis relies on the case of *Kidd v. State*, 258 So. 2d 423 (Miss. 1972), to support his position, the facts in this case are distinguishable. In *Kidd*, the trial judge denied the defendant's request to proffer witness testimony outside the presence of a jury concerning a conversation that took place between the defendant's father and the chief of police. *Id.* at 428. The supreme court found that, although the testimony was inadmissible, the appellant had the right to make his record. *Id.* In this case, the trial judge did not say that Lewis was not allowed to place the letter from his family into the record; he simply said that the letter "would be more appropriate during an entry of a plea of guilty, a sentencing[,] or a restitution proceeding" in accordance with the statute. Lewis did not attempt to introduce the letter at the sentencing hearing; therefore, this issue is without merit.

8

**III. Whether the weight of the evidence supports a murder or manslaughter conviction**.

¶21.    Although Lewis admits that he shot Church, he argued, both at trial and in his brief, that it was an accident.  He asks that this court render a manslaughter conviction based on the fact that there was not any evidence of malice.  Lewis states that his murder conviction represents "a manifest miscarriage of justice."

¶22.    Deciding whether a killing constituted murder or manslaughter is typically a question for the jury.  *Windham v. State*, 520 So. 2d 123, 127 (Miss. 1987) (citation omitted).  When determining if the evidence supports a verdict, this Court reviews the challenge in the light most favorable to the verdict.  *Graham v. State*, 120 So. 3d 382, 386-87 (¶18) (Miss. 2013) (citation omitted).  The prosecution is given the benefit of all favorable inferences that may reasonably be drawn from the evidence.  *Id*. at 387 (¶18).  The verdict will not be disturbed if this Court finds that "any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*.

¶23.    After thoroughly reviewing the record, we find that there was sufficient evidence to support Lewis's murder conviction.  The State put forth evidence that Lewis, while under the effects of alcohol and Ecstasy, shot a gun while arguing with his mother and killed her.  Mississippi Code Annotated section 97-3-19 (Rev. 2014) defines murder as:

> [T]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ; [or] [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]

The jury was instructed on both murder and manslaughter. We find that there is ample evidence to support that Lewis acted in a manner "eminently dangerous to others and evincing a depraved heart," when he shot and killed Church. The jury weighed the evidence and testimony offered at trial, and they found him guilty of murder. We find this argument is also without merit.

## CONCLUSION

¶24. For the foregoing reasons, the judgment of the circuit court is affirmed.

¶25. **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., NOT PARTICIPATING.**